IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GABRIEL SETH ELSTEIN, et al.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:18-cr-99<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

On August 14, 2019, Gabriel Seth Elstein and four other defendants were charged in a Second Superseding Indictment with conspiracy to distribute marijuana (18 U.S.C. §§ 841(a)(1), 846), conspiracy to commit money laundering (18 U.S.C. § 1956(h)), and other related charges. The four other defendants are Scott Dale Gordon, Angela Elstein,[1] David Clay Justice, and Robert Isaiah Viets.[2]  Each defendant had a different role in one or both conspiracies, but none of the roles were minor.  Pursuant to a subsequent two-count Felony Information, Elstein pled guilty to the marijuana and money laundering conspiracies. The United States argues Elstein should be

---

1  To distinguish Angela Elstein from Gabriel Elstein in this decision, the court refers to her as "Ms. Elstein."

2  Dumbles Holdings, LLC also was named, but the indictment against it has been dismissed with prejudice.  Order Dismissing Dumbles (ECF No. 268).

sentenced to 48-months imprisonment, while it has sought and continues to seek a term of imprisonment as low as zero months for the remaining defendants.

On January 16, 2024, in accordance with the United States' recommendation, Ms. Elstein was sentenced to one-year probation. She had the same total offense level and Sentencing Guidelines range as Elstein. She has been non-compliant with the terms of her probation since she was sentenced and is before the court to be sentenced again for her multiple probation violations. The United States continues to recommend probation for Ms. Elstein. Likewise, consistent with the United States' recommended sentences as low as zero months imprisonment for Gordon and Justice, the court has now sentenced them to probation.[3]

The court held an evidentiary sentencing hearing on October 30, 2024, for Elstein. Based on the United States' proposed sentencing disparity, the parties' briefing, and the evidence presented, the court concluded it needed to hear evidence and recommendations for the remaining defendants before it could proceed on any of the sentences, including sentencing for Ms. Elstein's probation violation. The court held additional hearings on November 4, 2024, and December 10, 2024, and then deferred sentencings while it took the matters under advisement. Having considered the evidence, oral argument, the parties' briefing, the Sentencing Guidelines, and all Section 3553 factors, the court concludes the proposed sentencing disparity is unwarranted. Accordingly, the court sentences Elstein to three-years-probation, together with a required

---

3  Viets requested that his sentencing be continued, and he will be sentenced on March 3, 2025. His level of participation in the conspiracies did not exceed that of the others, and the United States has recommended a sentence as low as zero months for him as well.

forfeiture of $10,000,000, which amount Elstein has paid already as a condition of his plea agreement.[4]

## FACTUAL AND PROCEDURAL BACKGROUND

**Overview of the Conspiracy**

This case involves a marijuana conspiracy where more than 5,000 pounds of marijuana were distributed between April 2007 and October 2014, yielding $10,000,000 in gross proceeds. Elstein was "one of the leaders and organizers of the [marijuana] conspiracy." Elstein Plea Statement, at 5 (ECF No. 253). Defendant Scott Dale Gordon was the other co-leader. Together they built a network where marijuana was obtained in California, transported across state lines, and then distributed in Utah, Illinois, Minnesota, and Wisconsin. By keeping two sets of books, Elstein, Gordon, and the other defendants were able to launder approximately $5,000,000 through various businesses. *Id.* at 6. Such laundering was in addition to their "promotional" laundering where marijuana proceeds were poured back into the business to purchases more marijuana and keep the operation funded. The length of the marijuana and laundering conspiracies, quantity of marijuana, and amount of gross proceeds show this was not an aberration in the defendants' conduct. For years the defendants were immersed in criminal conduct through a sophisticated operation, run like a business, without a typical factor of drug addiction driving the operation or conduct.

The above paints a picture of serious criminal activity, and if one looks only to those facts, a 48-month prison term may appear warranted. It is the other facts at issue that complicate the

---

4  Elstein had to secure a loan using business and personal real estate holdings as collateral to meet this condition. Elstein Sentencing Mem., at 16 & n.27 (ECF No. 286).

question of what an appropriate sentence is in this case to ensure Elstein's sentence is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

**Events Prior to the Conspiracies**

Elstein was introduced to marijuana during his senior year of high school and started using it recreationally. Mitigation Rpt., at 3 (ECF No. 286-1).[5] After graduating high school in 2003, Elstein moved out of his parents' home and started selling marijuana in small quantities to support himself. *Id.* He was eighteen years old and found a "false sense of financial security" because he was good at selling marijuana. *Id.*

Defendant Scott Dale Gordon reports that he has been involved in several successful businesses, and "did the accounting and record keeping work" for an auto repair business, and later "became a partner in Max's European Auto in 2004." Gordon Plea Statement, at 4 (ECF No. 191). In 2006, Gordon met a person ("B.Z.") "through Max's European Auto business" who needed a vehicle repair. *Id.* at 5. B.Z. was a marijuana dealer who paid Gordon "with a half-ounce of marijuana and five MDMA pills." *Id.* Later in 2006, Gordon learned that B.Z. had been "arrested for selling marijuana." *Id.* Gordon visited him in jail and helped pay his attorney bills. *Id.*

**Initial Introduction and Gordon's Subsequent Role**

Subsequently in 2006, B.Z. introduced Gordon to Elstein. During that meeting, Gordon agreed to provide Elstein "$40,000 to pay an existing marijuana debt he had and purchase additional marijuana," which amount was "approximately 80 pounds." Gordon Plea Statement, at 5 (ECF No. 191). The United States asserts Elstein "had a $40,000 drug debt in California [that] he wanted defendant Dale Gordon to pay for" and further asserts:

---

5 When citing a pincite to the record, the pincite refers to the ECF pagination at the top of the page.

> [h]aving a $40,000 drug debt means Gabe Elstein was both a trusted customer within the illegal marijuana drug trafficking industry and an up-and-coming shrewd drug dealer, eager to advance to the next level of satisfying his audacious ambition of becoming the largest marijuana drug dealer in Utah history – which he achieved.

Sentencing Mem., at 17 (ECF No. 278).  While Gordon did help pay Elstein's drug debt, the remainder of the United States' narrative is without factual support in the record.

During Gordon's sentencing hearing, Gordon attempted to explain how marijuana is funded, and how he left his money in to fund the next deal and the next because he was receiving a return on his investment.  The explanation was unclear about how the operation actually worked, and why $40,000 allowed Gordon to pay a debt and acquire 80 pounds of marijuana, with a wholesale value of $160,000.  What is known is that Elstein and Gordon agreed that if Gordon provided Elstein "with the $40,000, [they] would split the profits from the sale of the purchase of the additional marijuana."  Gordon Plea Statement, at 5 (ECF No. 191).

After Gordon agreed to front the money, Gordon "insisted on going to California to watch over [his] $40,000 investment in the marijuana purchase."  *Id.*  Gordon "drove alone to California" to meet with a distributor, and after giving the distributor the $40,000, Gordon waited "about two weeks in a hotel . . . waiting for the marijuana deal to occur."  *Id.*  Gordon "became concerned about [his] investment because of the length of time" that passed, but "eventually received" the marijuana, which he "then drove back to Salt Lake City."  *Id.*  Elstein sold the marijuana in Utah and Gordon received a return on his investment.  *Id.*  "Following the initial drug deal," Elstein and Gordon agreed Gordon's "initial investment would continue," and money from the first deal was then used to fund the next deal as Elstein and Gordon started developing their drug trafficking business.  *Id.* at 5–6; Gordon's Presentence Rpt., ¶¶ 15–16 (ECF No. 270).

5

The above evidence shows Gordon was already associated with a marijuana dealer at the time that dealer introduced Gordon to Elstein.  Gordon had been involved in prior businesses and "was searching for the next 'big money maker.'"  Mitigation Rpt., at 4 (ECF No. 286-1).  He invested to capitalize on his business skills and assist in growing a marijuana business.  Gordon Plea Statement, at 5 (ECF No. 191).  "Over the next few years," Elstein and Gordon "dramatically increased the amounts of marijuana [they] were purchasing and selling."  *Id.* at 6.

Elstein was twenty-one years old when he met Gordon, and Gordon was thirty-seven years old.  Mitigation Rpt., at 4 (ECF No. 286-1).  Elstein saw Gordon as a "role model and mentor." *Id.*  As the marijuana conspiracy developed, it was Gordon who taught various individuals "how to drive with a load of marijuana safely and discretely."  Gordon Plea Statement, at 6–7 (ECF No. 191).  It also was Gordon who warned Elstein "about the vulnerability of storing marijuana and drug money where [Elstein] was living."  *Id.* at 6.  Consequently, the two subsequently "leased a warehouse near Max's European Auto shop."  *Id.*  "The warehouse contained two safes," one to store marijuana and one to store money.  *Id.*  Initially, Elstein had access to both safes, but Gordon "only had access to the one safe containing marijuana."  *Id.*  In 2007, Gordon became "a 50/50 partner in the marijuana trafficking business," and at some point, obtained access to the money safes as well.  *Id.* at 8, 16.

**Expansion of Marijuana Distribution Channels and Defendants' Roles**

"In mid to late 2007," Elstein and Gordon expanded the marijuana conspiracy into Minnesota, and later into Illinois and Wisconsin.[6]  Gordon Plea Statement, at 8, 10–11 (ECF No. 191).  Elstein's role "was to purchase sizable quantities of marijuana for distribution," and

---

6   They "stopped selling marijuana in the Salt Lake City area" around 2008.  Gordon Plea Statement, at 12 (ECF No. 191).

"coordinate with marijuana-load drivers to deliver marijuana" in the specified states.  Elstein Plea Statement, at 5 (ECF No. 253).   Elstein "focused on expanding production in California." Mitigation Rpt., at 5 (ECF No. 286-1).  He did so, in part, by investing in growers "to buy and develop" properties for marijuana grow operations.  Gordon Plea Statement, at 10 (ECF No. 191).  Elstein's role also was to "recruit and coordinate with retail distributors in" the various states "to sell marijuana; and arrange and coordinate the return of the marijuana sale proceeds to the co-conspirators."  Elstein Plea Statement, at 5 (ECF No. 253).

Defendant David Clay Justice entered the conspiracies in 2008.  Justice Plea Statement, at 3 (ECF No. 184).  Justice was one of the growers in whom Elstein and Gordon invested.  Gordon Plea Statement, at 9 (ECF No. 191).  Justice was lawfully licensed with the State of California to grow marijuana for medical purposes.  *See* Justice Sentencing Mem., at 5 (ECF No. 353); Hearing Tr., at 39 (ECF No. 380).  He stepped outside the scope of the license when he became involved in the conspiracy and aided illegal distribution of the marijuana he grew.  *See id.*  Besides growing and supplying marijuana for the conspiracy, Justice brokered deals to obtain marijuana from other distributors to benefit the conspiracy.  Justice Plea Statement, at 3 (ECF No. 184).  Justice also coordinated with a driver to register two trucks in the individual's name to facilitate marijuana transport, and then recruited an additional person to be a driver.  *Id.* at 4.

Defendant Robert Isaiah Viets joined the conspiracies in 2009, after his sister Angela Elstein contacted him about a "business opportunity."  Viets Plea Statement, at 3 (ECF No. 147).  Viets agreed to meet with Elstein and Gordon, and they explained they needed a "middleman for shipment of marijuana and resell the marijuana to retail distributors."  *Id.*  Viets lived in Wisconsin and Elstein helped Viets set up the marijuana business.  *Id.* at 4.  Elstein taught Viets about the labeling system and how the marijuana was packaged.  *Id.*  Quarterly or semiannually, Elstein met

with Viets "to review the operation" and to "introduce [Viets] to distributors and attend meetings with distributors". *Id.* Viets "store[d] the marijuana until the retail distributors pick up." *Id.* Initially, Viets rented a storage unit, but later stored the marijuana in a rented cabin. *Id.* at 4–5. Viets estimates he helped distribute about 3,800 pounds of the 5,000 pounds of marijuana ultimately distributed through the conspiracy. *See id.* at 4 (totaling amount of first load and subsequent loads); Hearing Tr., at 20 (ECF No. 380). Viets communicated most often with Gordon "about which distributors would receive which part of the inventory." *Id.* Gordon primarily handled the money pickups and paid Viets. *Id.* at 5.

Viets met Justice in 2010 or 2011 when Viets flew to California to examine Justice's marijuana extraction operation. *Id.* at 6. Viets had previous "experience with the extraction processes," *id.*, although what that experience was or how it was obtained is not in the record. Viets saw workers in the building, "a fire burning in a compost pile,' and concluded after observing the extraction operation, that he did not want to be involved "in improving the process" because he was concerned "they were going to get arrested." *Id.* Based on statements made at a hearing on December 10, 2024, Justice's THC extraction operation did not become part of the conspiracy's marijuana business. Hearing Tr., at 32 (ECF No. 380).

After running strong for years, the marijuana conspiracy started to winddown in 2013 as Elstein became less focused, Gordon started to feel some burnout, and quality issues were occurring with the marijuana. Gordon Plea Statement, at 13 (ECF No. 191). Gordon, Viets, and Justice continued with the marijuana trafficking until about October 2014, but Elstein stopped participating at the end of 2013. *See* Elstein Plea Statement, at 5 (ECF No. 253); Gordon Plea Statement, at 13–14 (ECF No. 191).

8

**Money Laundering Conspiracy**

The money laundering conspiracy involved three types: expenditure, promotional, and concealment.  The promotional money laundering involved using marijuana proceeds to purchase additional marijuana for distribution and fund operations.  Ms. Elstein Plea Statement, at 4 (ECF No. 204).  Additionally, Gordon set up a system to launder money through a music production business ("Bondad Productions" or "Bondad Promotions") and a concert venue ("The Complex") by establishing and maintaining two sets of books for the businesses from April 2007 through December 2013.  *Id.* at 5.

The first set of books contained "the actual income and expenses for each [concert] show." Gordon Plea Statement, at 15 (ECF No. 191).  The second set contained altered show information, where "ticket sales, concession and merchandise sales, parking and VIP services" were increased, and "expenses such as labor costs" were lowered or deleted.  *Id.*  The difference between income and expenses gave room to launder the marijuana proceeds and deposit the cash in bank accounts. *Id.*  Money also was laundered by paying some of the business expenses with cash.  *Id.*  Key employees, who were unaware of the money laundering, had access to different safes from which they could draw cash to pay general expenses.  *Id.* at 16.  Because the businesses handled a lot of cash, it made the marijuana proceeds appear legitimate.  *Id.* at 16–17.

From 2008 through the end of 2013, Gordon handled the bank deposits and developed a system "so there would not be a pattern" to the deposits that would raise questions.  Gordon Plea Statement, at 16 (ECF No. 191).  Before making the deposits, Gordon and Elstein would meet "to decide how to split the money."  *Id.*

Starting in 2009, Gordon taught Ms. Elstein[7] how to help with the money laundering and maintain "the marijuana business books and records."  Ms. Elstein Plea Statement, at 5 (ECF No. 204).  Ms. Elstein played a significant role in the money laundering conspiracy.  Gordon, Elstein, and Ms. Elstein "met a number of times . . . to discuss how much marijuana proceeds to launder through the Complex and how much to put on the books."  *Id.*  After training Ms. Elstein, Gordon continued to be involved with laundering through The Complex until the end of 2013.  *Id.* (stating when Gordon stopped "maintain[ing] two sets of records for . . . The Complex").  Ms. Elstein then handled the finances for The Complex as it was transitioned into a legitimate business.  "Tax returns for The Complex, Bondad Productions and all the related companies were prepared and taxes paid on the marijuana money laundered through these businesses,"  Elstein Plea Statement, at 7 (ECF No. 253), so tax evasion is not at issue in this case.

**Change of Roles and End of Conspiracies in October 2014**

Elstein reports that after he became a father in 2010, his "outlook on life changed."  Mitigation Rpt., at 5 (ECF No. 286-1).  He became concerned about potential consequences for his actions and the impact it could have on his family.  *Id.*  When his second child was born in 2012, Elstein determined he needed "to separate himself from [Gordon] and the marijuana business."  *Id.* at 6.  Previously, Elstein had not had much involvement with The Complex.  *Id.* at 5.  It was struggling financially, and the marijuana proceeds helped "keep it afloat."  Ms. Elstein Plea Statement, at 5 (ECF No. 204).  Some of the employees did not like how Gordon ran the

---

7 Gabriel and Angela Elstein married in or about 2010, *See* Mitigation Rpt., at 5 (ECF No. 286-1), but Ms. Elstein was already involved in the marijuana and money laundering conspiracies by 2009.  *See* Justice Plea Statement at 3 (ECF No. 184) (seeing Ms. Elstein inventory marijuana in 2009 or 2010); Ms. Elstein Plea Statement, at 5 (ECF No. 204) (stating Gordon transferred record keeping responsibilities to Ms. Elstein in 2009).  The couple is now separated, and divorce proceedings are pending.

business.  Mitigation Rpt., at 5–6 (ECF No. 286-1).  "In January 2013, [Elstein] began negotiating with [Gordon] to trade his share of the marijuana business for [Gordon's] share of The Complex and dissolve their partnership."  *Id.* at 6 (italics omitted).  "By November 2013," they reached an agreement for Gordon to "sign over The Complex to [Elstein]."  Gordon Plea Statement, at 13 (ECF No. 191).  By the end of 2013, Elstein had stopped participating in (but did not withdraw from) the conspiracies and was running The Complex.  Elstein Plea Statement, at 5 (ECF No. 253); Mitigation Rpt., at 6 (ECF No. 286-1).  Gordon, Justice, and Viets continued participating in the conspiracies until both conspiracies ended in October 2014.

As stated above, Gordon contends he determined a change was needed after Elstein became "less focused."  Gordon Plea Statement, at 13 (ECF No. 191).  When problems started to arise in the marijuana distribution network with quality control issues, Gordon traveled to Wisconsin in September 2013 to assess the situation.  *Id.*  He determined over 300 pounds of marijuana were damaged.  *Id.*  According to Gordon, however, he signed The Complex over to Elstein based on Gordon's lack of understanding about the severity of the problems with the marijuana business.  *See id.*  In other words, Gordon implies he was bamboozled by Elstein into making a bad deal, even though The Complex was a failing business when Elstein took it over, and Gordon had been deeply immersed in the marijuana business.  Gordon has no assets to show for his participation in the conspiracies.

**After The Conspiracies**

After Elstein stopped participating in the conspiracy, Elstein built The Complex into a successful business.  The Complex has "really loyal employees who have been with [the business] a long time."  Hearing Tr., at 64 (ECF No. 375).  Two employees testified The Complex "operate[s] as a team" and has "a team philosophy."  *Id.* at 61, 79.  It is viewed as "a family," where the

employees "look out for each other." *Id.* at 79.  Elstein is credited for creating the environment and being an essential part of the business. *Id.* at 62, 79.  When one employee was facing going on disability due to medical issues, Elstein covered needed medication and made adjustments to help make it possible for the employee to continue working. *Id.* at 80–82.  Elstein also helped the employee when the employee lost his mother and later lost his father. *Id.* at 80–81.  Elstein accomplished his goal of turning The Complex into a successful business free from drug money.

Four years after the marijuana and money laundering conspiracies ended, special agents from the IRS and DEA were investigating the Elsteins.  In March 2018, a DEA did a search of the Elsteins' trash and found a handwritten pay/owe sheet of paper that "had been ripped up many times."  Hearing Tr. at 14 (ECF No. 375).  After reassembling it, the paper showed amounts that were paid and amounts that were owed. *Id.*  It was in Elstein's handwriting. *Id.* at 42–43.  There was no date on the paper and no indication of when the pay/owe sheet may have been drafted. *Id.* at 40.  There was no way to identify if it was recently drafted or had been drafted five or more years prior. *Id.*

Later that same month, the agents obtained a search warrant and found .75 pounds of marijuana at the Elsteins' residence.[8] *Id.* at 15–16, 20.  Count Three of the Second Superseding Indictment charged Gabriel and Angela Elstein with possession with intent to distribute.  Second Superseding Indictment, at 15–16 (ECF No. 51).  A DEA agent testified, however, that .75 pounds is not necessarily a distribution amount.  Hearing Tr., at 23 (ECF No. 375).  According to Gordon,

---

[8]  The United States asserted in its amended sentencing memorandum that it "is undisputed . . . that [Elstein] had 622 grams (approximately a pound and a half), of packaged marijuana."  U.S. Amended Sentencing Mem., at 19 (ECF No. 321).  At Elstein's evidentiary sentencing hearing, the weight was clarified because it included the weight of the packaging.  When the packaging was removed from the total weight, the Elsteins had .75 pounds of marijuana at their residence. Hearing Tr., at 20 (ECF No. 375).

the amount was only a user amount for the Elsteins. *Id.* at 41–42. Based on the above, there is not sufficient evidence to show that the Elsteins continued to distribute marijuana after the conspiracies ended.

Elstein and Gordon were arraigned in April 2018. Minute Entry (ECF No. 11). Ms. Elstein was arraigned in October 2018. Minute Entry (ECF No. 36). Justice and Viets were arraigned in August 2019. Minute Entry (ECF No. 54). All were placed on pretrial release. Since his arrest, Elstein has demonstrated his commitment to being a model citizen. It has now been almost seven years since his arrest, and in those seven years, Elstein has never violated the terms of his pretrial release. All monthly reporting has been submitted on time. All documentation has been supplied. Every drug test (reportedly approximately 100 in total) has been passed. Elstein has met every condition of his pretrial release. For more than a decade, Elstein has helped support a cancer foundation, and more recently a foundation to help at-risk children. *See* Lttr. (ECF Nos. 286-2); Hearing Tr., at 70–71 (ECF No. 375). Additionally, for the past several years, Elstein has assumed primary parenting responsibilities of his three minor children after separating from his wife who presently lacks the capacity to care for the children adequately. In sum, Elstein has met every condition of his pretrial release, under close supervision, all while parenting his three children, running a successful business, and serving the community.

**Other Defendants on Pretrial Release**

Justice and Viets also appear to have turned their lives around and have performed well on supervision. The same cannot be said for Ms. Elstein and questions exist about Gordon's supervision. Although Gordon has been on pretrial supervision since April 2018, it appears his supervision has been lax. Gordon lives most of the time in Wisconsin, but pretrial services did not transfer supervision there, it appears, because Gordon reported also living in Utah part of the time.

13

*See* Status Rpt., at 1 (ECF No. 367).  The court has recently learned that from April 2018 to March 2019, Gordon submitted to drug-testing seven times and failed four of the tests.  *See id.* at 2 (stating dates of the failed tests).  Then for almost a five year period from March 2019 to November 2023, Gordon was tested only fifteen additional times, all of which were negative.  He has had no drug testing for over a year, Status Rpt., at 2 (ECF No. 367), and it appears the only time he is drug tested is when he is in Utah, thereby avoiding the element of random drug testing.

Gordon reported to pretrial services that he was living in a motorhome in Wisconsin, but during the hearing on December 10, 2024, Gordon admitted he and his family are living in a home in Wisconsin.  *Cf* Status Rpt., at 1 (ECF No. 367) *with* Hearing Tr., at 37 (ECF No. 380).  It does not appear that change was reported.  In 2019, Gordon traveled internationally without permission on two occasions.  Petition & Order (ECF No. 66).   Thereafter, the United States and Gordon entered into a stipulated agreement for Gordon to be able to travel internationally for work.  Stip. to Modify Conditions of Release (ECF No. 78).  The court granted that authorization subject to specific conditions.  Order (ECF No. 79).

According to the court's understanding, Gordon was in business with Viets to help grow a company named CelBlox and a sister company called Micro Technologies.  *See* Status Rpt., at 1 (ECF No. 367) (reporting Gordon's ownership interest in CelBlox); Gordon's Lttr., at 7–8 (ECF No. 366).  Gordon's work at those businesses reportedly necessitated the international travel.  In the past year, Gordon also obtained employment at a hotel in Wisconsin.  Status Rpt., at 1 (ECF No. 367).  Gordon recently submitted a letter to the court that reported his work at the hotel and at CelBlox.  Gordon Lttr., at 7–9 (ECF No. 366).  The letter did not report that Gordon has ceased working with Viets.  Yet, at the December 10, 2024, hearing, Viets reported Gordon is not

associated with any of Viets' businesses.  Hearing Tr., at 48, 52 (ECF No. 380).  Gordon did not refute or clarify Viets' statement despite Gordon being present at the hearing.

Because Gordon works for a hotel in Wisconsin, and no longer (if ever) works with Viets, Gordon's work should no longer require international travel.  Those changes should have been reported to pretrial services so Gordon's pretrial release conditions could have been adjusted. Based on the above, although Gordon has been on pretrial release for almost seven years, he has had minimal supervision, and it is questionable whether he actually has been complying with all of his release conditions.

As for Ms. Elstein, pursuant to a Rule 11(c)(1)(C) agreement, she was sentenced to a term of one-year probation on January 16, 2024.  Ms. Elstein Plea Statement, at 7 (ECF No. 204); Judgment, at 1–3 (ECF No. 234).  Her conduct prior to sentencing, however, was concerning.  In October and November 2023, Ms. Elstein tested positive for marijuana while on pretrial release. Petitions & Orders (ECF Nos. 206, 211).  Throughout the remainder of November 2023 and into December 2023, Ms. Elstein failed to submit to drug testing on three occasions.  Petition & Order (ECF No. 225).

At sentencing, the court warned Ms. Elstein that her probation could be revoked, and she could be sentenced to a term of imprisonment if she violated the terms of her probation.  Yet, since she started her term of probation, Ms. Elstein has been non-compliant.  She failed to submit to drug testing for several months, she subsequently tested positive for cocaine on multiple occasions, and she persistently has not provided reports that are required.  Petition & Order (ECF No. 290); Violation Rpt. (ECF No. 341); Minute Entry (ECF No. 349).  What reports have been submitted raise concerns about her income stream and expenses.  Despite requests for documentation of income and employment, Ms. Elstein has not provided the needed documentation.

Furthermore, although Ms. Elstein led the court to believe, at her sentencing hearing, that she was equally co-parenting with Elstein, it is now clear that was and is inaccurate. The children live with and are primarily cared for by Elstein. This is not to say Ms. Elstein has no involvement with her children. She does, but she is not presently able to care for them, although she has recently completed intensive outpatient treatment for mental health issues. Additionally, Ms. Elstein is now cohabitating with a man who declined to testify at an evidentiary hearing on the basis that his testimony may incriminate him, even though the United States avowed it would not prosecute him. Ms. Elstein's probation violations remain at issue before the court, including what her sentence will be for her repeated violations. With all the above facts in mind, the court now addresses the sentencing factors.

## ANALYSIS

Congress has established "a framework to govern [a court's] consideration and imposition of sentences," *Tapia v. United States*, 564 U.S. 319, 325 (2011), by which a court is required "to consider seven factors." *United States v. Crosby*, 119 F.4th 1239, 1247 (10th Cir. 2024) (citation omitted). The factors are to be evaluated holistically, such that a court cannot "rely solely on one § 3553(a) factor without addressing other relevant factors." *Id.* (citation omitted). Nevertheless, a "court need not afford equal weight to each § 3553(a) factor." *Id.* (quotations and citation omitted). The weight afforded depends upon the defendant before the court at sentencing because the sentence should "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88, 492 (2011) (quotations and citation omitted). "[T]he starting point and the initial benchmark" are the Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49 (2007). Extraordinary circumstances, however, are not required "to justify a sentence outside the Guidelines range." *Id.* at 47. The court now turns to the Sentencing Guidelines and § 3553 factors.

16

I.      NATURE OF THE OFFENSE AND OFFENDER CHARACTERISTICS

A.      Nature of the Offense

As stated above, this case involves a marijuana conspiracy where more than 5,000 pounds of marijuana were distributed between April 2007 and October 2014, yielding $10,000,000 in gross proceeds.  It also involves a money laundering conspiracy where $5,000,000 was laundered under Gordon's system and tutelage.  The crimes were serious, and the length of the conspiracies show a long-standing disregard for the law.

In its briefing and at Elstein's evidentiary sentencing hearing, the United States detailed the harm that can result from illegal marijuana distribution.  In California, the Riverside County Sheriff has "expressed his frustration" over "[t]he marijuana green rush" attracting "Mexican Drug cartels and Asian human smuggling rings," where there have been multiple homicides, kidnappings, human trafficking, and rapes.  U.S. Amended Sentencing Mem., at 9 (ECF No. 321) (quotations and citation omitted).  The San Bernardino County Sheriff has expressed similar concerns with crime spiraling from "illegal marijuana grows." *Id.* at 10 (quotations and citation omitted).  Some marijuana growers also use toxic fertilizer and outlawed chemicals that harm the environment, and "[t]hirteen wildfires have been linked to grows in the past dozen years" as water is diverted to growing marijuana.  *Id.* at 8–9.  Such harms are not limited to California.  In Utah, there have been shootings and homicides related to illegal marijuana distribution and buys.  *Id.* at 10–11.

Notably, however, the nature of the offense at hand involved no violence.  There were no related homicides, kidnappings, human trafficking, or rapes.  There were no weapons, no drug cartels, no gangs.  Elstein, Gordon, and Justice often dealt directly with other marijuana growers, invested in the growers' operations, and in Justice who was one of the growers.  Additionally,

17

there were no other types of drugs involved, such as cocaine, heroin, methamphetamine, ecstasy, fentanyl, etc.  It was a pure marijuana operation, run and treated like a non-violent business operation.

As for money laundering operations, they are a serious crime because of their "social consequences."  Financial Crimes Enforcement Network, *What is Money Laundering?*, https://www.fincen.gov/what-money-laundering.  As in this case, money laundering facilitates drug trafficking, but also has been known to fund "terrorists, arms dealers," and other "criminal enterprises."  *Id.*  Through laundering, criminals have "manipulate[d] financial systems in the United States and abroad to further a wide range of illicit activities."  *Id.*

While money laundering can have far-reaching implications, in this case, the money only funded a marijuana operation and concert venue.  It did not fund trafficking of any other drug.  No proceeds went to fund weapons, cartels, terrorist cells, or other violence, and the defendants ensured that taxes were paid on the proceeds, thereby avoiding compromising the United States' financial systems.  There also were no identifiable victims of either conspiracy.  These factors mitigate the nature of the offenses.

Also relevant to mitigation is that "[a]s of February 2024, 47 states, the District of Columbia, and 3 territories (Guam, Puerto Rico, U.S. Virgin Islands) allow for the use of cannabis for medical purposes," and as of that same date, "24 states, the District of Columbia, and 2 territories (Guam and North Marian Islands)" have legalized adult recreational use of marijuana. CDC State Medical Cannabis Laws (Feb. 16, 2024), https://www.cdc.gov/cannabis/about/state-medical-cannabis-laws.html.  Those statistics are startling when one considers that marijuana remains an illegal drug under federal law.  Societal norms among the States and Territories show

a markedly different viewpoint from the Schedule I classification by the United States.[9] Only three states (Idaho, Nebraska, and Kansas) disallow all use of marijuana as of February 2024. *Id.* Among the states where the defendants' conspiracies operated, Utah and Wisconsin permit medical use of marijuana, while Minnesota and Illinois permit both medical and recreational use. *Id.*

How to address the disparity between federal and state laws has been an ongoing issue for the Department of Justice (the "Department"). In 2013, the United States Deputy Attorney General issued a memorandum about marijuana enforcement. James M. Cole, *Guidance Regarding Marijuana Enforcement* (Aug. 29, 2013), https://www.govinfo.gov/app/details/GOVPUB-J-PURL-gpo140706 (pdf download). In an effort to conserve resources, the Department prioritized what conduct it would prosecute. If a state had laws authorizing "marijuana production, distribution, and possession," the Department determined the state should be "the primary means of addressing marijuana-related activity." *Id.* at 2–3. Although the Department had previously focused on "large-scale, for-profit commercial enterprises," it stated in the 2013 Memorandum that if a state had adequate regulatory enforcement, even those large enterprises may not necessarily pose a "federal enforcement priority." *Id.* at 3.

This resulted in a patchwork system of justice, as noted in *United States v. Burciaga-Duarte*, No. CR 14-0592 JB, 2015 WL 3862946, at *6–7 (D.N.M. June 9, 2015). That court was concerned about the Department prosecuting marijuana distribution cases in New Mexico, but not in Colorado or Washington, due to the impact on various sentencing factors and disparities. *Id.* at

---

9   Although the court notes the present societal norms and changing landscape concerning marijuana, its observations are for purposes of noting mitigating factors versus favoring the changes.

*7–8.  The Department's approach resulted in 3 people being convicted in Colorado and 352 individuals being "convicted in the District of New Mexico." *Id.* at *7.  In 2018, the Department rescinded its previous guidance and informed prosecutors they could pursue marijuana-related activity according to the prosecutor's judgment, Jefferson B. Sessions, III, Attorney General, *Marijuana Enforcement* (Jan. 4, 2018), but that has not ensured consistency in how the law is applied.

The effects of marijuana are still being studied, but it is apparent it is not without risks.  Impaired driving and health risks have been associated with it use.  The same may be said about alcohol use, however.  Recently, the United States Department of Health and Human Services ("HHS") "emphasized that an evaluation of various epidemiological databases of adverse outcomes from 2015 to 2021 involving marijuana or comparator drugs that are used nonmedically showed" adverse outcomes involving marijuana were lower than for other comparator substances, including alcohol.  Schedules of Controlled Substances:  Rescheduling of Marijuana, 89 Fed. Reg. 44,597, 44,601 (proposed May 21, 2024).  Specifically, HHS stated:

> [The] utilization-adjusted rate of adverse outcomes involving marijuana was consistently lower than the utilization-adjusted rates of adverse outcomes involving heroin, cocaine, and for certain outcomes, other comparators, including alcohol.  Also, alcohol or heroin typically ranked first or in immediately subsequent positions among the comparators in terms of incidence of adverse outcomes, with marijuana in a lower place in that ranking.  This pattern also was observed for serious medical outcomes, including death, observed in Poison Center data, where marijuana was in the lowest ranking group.  This suggests consistency across databases, across drugs, and over time.  HHS thus concluded that although abuse of marijuana produces clear evidence of harmful consequences, these appear to be relatively less common and less severe than the consequences of some other comparator substances.

*Id.*  Based on its analysis, HHS has recommended that marijuana be rescheduled.

"[C]onsistent with the view of [HHS] that marijuana has a currently accepted medical use as well as HHS's views about marijuana's abuse potential and level of physical or psychological dependence," the Department of Justice, Drug Enforcement Administration has issued a notice of proposed rulemaking potentially to reschedule marijuana from a Schedule I drug to a Schedule III drug. *Id.* at 44,597.  It is unknown if the rule will be finalized, but the proposal shows marijuana is not viewed the same as cocaine, heroin, methamphetamine, fentanyl, ecstasy, etc.

President Joseph R. Biden Jr. also has distinguished marijuana from other Schedule I drugs when he issued *A Proclamation on Granting Pardon for Offense of Simple Possession of Marijuana*. Proclamation No. 10467, 87 Fed. Reg. 61,441 (Oct. 6, 2022).   Through that proclamation, President Biden pardoned "all current United States citizens and lawful permanent residents who committed [or who have been convicted of] the offense of simple possession of marijuana in violation of the Controlled Substances Act." *Id.*  On December 22, 2023, President Biden expanded the pardon to include those who "attempted simple possession of marijuana, or use of marijuana, regardless of whether they have been charged with or prosecuted for these offenses on or before the date of this proclamation."  Proclamation No. 10688, 88 Fed. Reg. 90,083 (Dec. 22, 2023).  The court recognizes the focus of the pardons was on simple possession, while this case involves a large marijuana distribution conspiracy.  Distribution, however, funnels down to those individual users who were pardoned because the President of the United States has determined such individuals should not have a criminal conviction for marijuana possession or use.

The DOJ memoranda, proposed rulemaking, presidential proclamations, and changing societal norms have weakened the impact of the Controlled Substances Act on marijuana-related activities, and the corresponding characteristics of the case at issue.  Additionally, in contrast to

Elstein's sentencing hearing, at the December 10, 2024, sentencing hearings for Gordon, Viets, and Justice, the United States opened its remarks by acknowledging this case is not one its office typically prosecutes any more.  Hearing Tr., at 4–5 (ECF No. 380).  It further noted the changing societal norms, the likelihood that marijuana will be rescheduled in the future, and the four years in between the end of the conspiracies and Elstein and Gordon's arrests.  *Id.* at 5.  Those mitigating factors apply equally to Elstein, and it is troubling that the United States would present one set of arguments about marijuana at Elstein's hearing, but a different set of arguments about marijuana at Gordon, Justice, and Viets' hearings.  In sum, the nature of Elstein's conspiracies were serious crimes, but both have important mitigating factors that distinguish them from other drug trafficking and money laundering conspiracies.

### B.  Offender Characteristics

"'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Id.* at 487–88 (quotation and citations omitted).  It also is "'a court's duty . . . always to sentence the defendant as he stands before the court on the day of sentencing.'"  *Id.* at 492 (alteration omitted) (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (*per curiam*)).  Consequently, the United States Supreme Court has "emphasized that 'highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'"  *Id.* at 488 (alterations omitted) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

In this case, Elstein has no prior criminal history, and became involved in the conspiracies in his early twenties.  In 2013, Elstein voluntarily ceased participating in the marijuana and money laundering conspiracies.  He did so due to concerns about potential consequences for his actions and the impact it could have on his family.  Elstein negotiated with Gordon for Elstein to take over The Complex so Elstein could turn it into a business independent of criminal activity.  The Complex was failing before Elstein took it over.  Marijuana proceeds helped sustain it.  Elstein succeeded in turning it into a successful, legitimate business.  Besides building a successful business, Elstein started contributing to the community and became involved in helping a cancer foundation.  More recently, he has become involved in a foundation to help at-risk students and has used The Complex to help raise money for the foundation.

Although a user amount of marijuana was located at the Elsteins' residence in early 2018, since Elstein's arrest in April 2018, he has never violated the terms of his pretrial release.  He has passed every drug test, submitted all required reports, and has maintained a life free from any criminal activity.  Elstein is also now the primary caregiver to his three minor children and has been for several years, as Ms. Elstein has struggled in her life.  As Elstein stands before the court today, he is not the same man he was in his twenties and during the conspiracies.  He chose to reform his life over four years prior to his arrest and is a law-abiding citizen.  This factor weighs strongly against a term of imprisonment.

## II.    NEED FOR A SENTENCE TO REFLECT THE BASIC AIMS OF SENTENCING

The basic aims of sentencing have several factors to consider, as stated under 18 U.S.C. § 3553(a)(2).

A.      Retribution

The first purpose of sentencing is a retribution component.[10]  *Tapia*, 564 U.S. at 325 (2011).  The retribution component "includes three considerations:  seriousness of the offense, respect for the law, and just punishment for the offense."  *United States v. Johns*, No. 22-2008, 2023 WL 7321753, at *7 (10th Cir. Nov. 7, 2023) (quotations and citation omitted).  When addressing these basic aims, "a sentencing court shall impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense [and] promote respect for the law."  *United States v. Sells*, 541 F.3d 1227, 1237 (10th Cir. 2008) (citing 18 U.S.C. § 3553(a)).  Retribution embodies "the idea that an offender owes a pound of flesh to society for committing a crime.  Retribution can be focused on the harm done to an individual victim, or in victimless crimes, to society writ large."  Raquel Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 Dick. L. Rev. 461, 471 (2024).  This case involves victimless conspiracies, so the retribution would be to address the wrong to society.

As stated above, societal views about marijuana have been evolving.  Distribution for recreational use has now become the norm in the District of Columbia and 24 states, including in two of the four states where the defendants were distributing the marijuana.  What constitutes a just punishment in this context is different from what would be just in other drug trafficking cases because society, at large, has rejected the criminality of recreational use of marijuana.  Societal concerns also were not raised by the specter of violence from firearms, drug cartels, or gangs, because those elements were not at issue here.

---

10   Elstein has been on pretrial release for almost seven years, with close monitoring.  That supervision does not constitute punishment for purposes of sentencing.  *See United States v. Walker*, 844 F.3d 1253, 1257 (10th Cir. 2017).

Yet, the amount of marijuana that was distributed is significant.  And it was distributed illegally.  Consequently, the retribution component is still applicable in this case, but must be viewed under the totality of the circumstances.  Otherwise, a disrespect for the law can occur if retribution is not balanced properly against societal views concerning marijuana.  *See Gall*, 552 U.S. at 54  (noting "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing") (quotations and citation omitted)).

In terms of the money laundering conspiracy, Elstein has forfeited $10 million dollars to redress any *gross* receipts from the conspiracies.  "Criminal forfeiture is an *in personam* action in which the forfeiture of and the vesting of title in the United States in the defendant's tainted property is imposed as a punishment against the defendant."  *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010) (quotations and citation omitted).  Forfeiture is punitive, and "seeks to disgorge any profits that the offender realized from his illegal activity."  *Id.* (quotations and citation omitted).  It is "based on the offender's gain."  *Id.* (quotations and citation omitted).

In this case, Gordon played a lead role in both conspiracies.  At Gordon's sentencing hearing, the United States acknowledged it could have pursued forfeiture against him of $5,000,000.  Hearing Tr., at 22–23 (ECF No. 380).  Instead, it negotiated for Gordon to forfeit only $1 million.  *Id.*  The United States also negotiated a lower forfeiture amount for Justice and Viets, *id.* at 51, and it further obtained a forfeiture from Ms. Elstein.  Judgment, at 8 (ECF No.

234).  Yet, the United States still pursued forfeiture against Elstein for the full $10,000,000 in gross proceeds.[11]

As stated above, Elstein's forfeiture is not something the United States will be collecting on over many years.  He has already paid the forfeiture amount.  Elstein had to obtain a loan, and is paying a substantial monthly payment, so he could raise enough money to pay the forfeiture immediately, per the United States' requirements.  No other defendant has satisfied his or her forfeiture amounts in full, as of this date, despite receipt of such proceeds during the conspiracies, and the other defendants' negotiated amounts being substantially less than Elstein's.  This is not about socio-economic differences.  It is about comparative punishments, and about Elstein doing all that he can to repay society and put a decades-old chapter of his life behind him.  From a retribution perspective, the disparate forfeiture punishment imposed on Elstein is substantial to address societal concerns about money laundering.

## B.     Deterrence

### i.     General Deterrence

"[D]eterrence is the idea that imprisonment deters others (general deterrence) or the offender (specific deterrence) from reengaging in crime once they are released."  Raquel Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 Dick. L. Rev. 461, 472 (2024).  Congress specifically focused on deterring "'others from committing the offense.'"  *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (quoting S. Rep. No.

---

11  The United States asserts The Complex exists only because of the conspiracies.  The Complex, as a business, was failing when Elstein acquired it.  The conspiracies did not make The Complex into its present success.  Elstein did when he built the business independent of the marijuana proceeds and money laundering.  While The Complex may have been rooted in the conspiracies prior to 2014, at some point, attenuation has severed the ties to what constitutes forfeitable proceeds under the circumstances of this case.

98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259)).  "General deterrence is one of the key purposes of sentencing."  *Id.* (quotations and citation omitted).  According to the Tenth Circuit, "[g]eneral deterrence comes from a probability of conviction and significant consequences."  *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015).

In this case, the United States acknowledged at Gordon, Justice, and Viets' sentencing hearing, this is not the type of case the United States typically prosecutes.  Observations from another court show how inconsistent the Department has been pursing marijuana-related convictions across the various states.  The Department has grappled with its role in prosecuting marijuana-related crimes, and it has changed its policy multiple times over the years.  It now supports marijuana being rescheduled.  These factors have weakened or defeated the general deterrent effect for marijuana-only trafficking because the probability of conviction and corresponding consequences have become uncertain and unpredictable.  Imprisoning Elstein is unlikely to re-establish a general deterrent effect based on the evolving viewpoints concerning marijuana.

As for the money laundering conspiracy, it is a white-collar crime.  When a white-collar crime is at issue, "Congress has recognized that general deterrence is particularly important . . . because defendants in white-collar crimes often calculate the financial gain and risk of loss." *Sample*, 901 F.3d at 1200 (quotations, citations, and alteration omitted).  Thus, according to Tenth Circuit caselaw, a serious punishment may deter others from committing a white-collar crime.  *Id.* (citation omitted).  The Tenth Circuit is not alone in such views.

Being free from danger posed by criminal behavior is a foundational human need.  Decreasing crime rates helps satisfy that need.  As more is learned through studies, however, "[t]here is broad consensus among researchers that increasing certainty of punishment is usually

more effective than making punishment more severe.  In other words, if the person contemplating a crime is reasonably certain that his act will be detected and punished, a longer term of years will not meaningfully enhance the deterrent."  David Crump, *Deterrence*, 49 Saint Mary's L.J. 317, 332 (2018) (citation omitted).  Accepting this view about harsher sentences is contrary to the desire for a safer society, whereas "[i]ncreasing a sentence range is a readily available answer, even if theorists conclude that it will not be very effective."[12]  *Id.*

Specifically concerning white-collar crimes, there also is a concern to ensure the "'socioeconomic status of offenders'" does not influence the length of a sentence.  Carlton Gunn & Myra Sun, *Sometimes the Cure Is Worse than the Disease the One-Way White-Collar Sentencing Ratchet*, Hum. Rts., Summer 2011, at 9 (quoting 28 U.S.C. § 944(d)).  This is important to a system of justice.  Yet, to eliminate disparities between white collar and blue-collar crimes, the focus has been on increasing the severity of white-collar crimes rather than on decreasing the severity of blue-collar crimes.  *Id.* at 11.  Notably, that focus has not been based on empirical research.  *Id.*  It has been driven, in part, by the need to address high-profile fraud cases.  *Id.*  The result has been a steady increase in the Sentencing Guidelines ranges for white-collar crimes.  *Id.* at 10–11.  Professor Frank Bowman, a former Department of Justice expert, has observed the Guidelines ranges have "become 'a one-way upward ratchet increasingly divorced from considerations of sound public policy and even from the commonsense judgments of frontline sentencing

---

12  Although severity of punishment does not typically have the corresponding deterrent effect hoped for, this does not mean it universally has had no effect.  For example, severity of punishment under the "three-strikes law . . . for three qualifying felonies, was followed by a statistically significant decrease in defendants eligible for the more severe sentence.  One can infer that this effect was the product of deterrence since it focused on defendants not yet incarcerated."  David Crump, *Deterrence*, 49 Saint Mary's L.J. 317, 335 (2018) (citation omitted)

professionals who apply the rules.'" *Id.* (quoting Frank Bowman, *The Failure of the Federal Sentencing Guidelines; A Structural Analysis*, 105 Colum. L. Rev. 1315, 1319–20 (2005)).

Because severity of punishment is typically less of a deterrent than certainty of punishment, the prosecution of Elstein and the other defendants for money laundering is itself a deterrent. Moreover, criminal forfeiture not only is a punishment, it is also a deterrent to "future illegality, and lessen[s] the economic power of criminal enterprises." *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quotations and citations omitted). Despite Elstein ceasing to participate in the conspiracy after 2013, he still faced arrest in 2018, and the loss of all proceeds from the conspiracy. Certainly, when engaging in a cost benefit analysis for a white-collar crime, Elstein's forfeiture of $10 million dollars in gross proceeds shows "that crime does not pay." *Id.*

Considering the totality of the circumstances and present studies, the court concludes the greatest general deterrent for money laundering cases of this sort is the certainty that one will be prosecuted for the crime and required to disgorge any benefits from the money laundering. Increasing the severity of punishment for one defendant (Elstein), while Gordon and Ms. Elstein receive probation, will not result in a general deterrent effect.

  ii.  *Specific Deterrence*

The court now addresses deterrence specific to Elstein. While Congress concluded white-collar crimes may be more amenable to the deterrence effect than violent crimes, it bears noting that the Congressional statements relied upon date back to the 1980s. "Beginning in the 1970s, the United States began an experiment in mass imprisonment. Supporters argued that harsh punishments such as imprisonment reduce crime by deterring inmates from reoffending." Damon M. Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 Crime & Just. 353, 353 (2021). Now, decades later, studies have shown "that custodial sanctions have no effect

on reoffending or slightly increase" the likelihood of reoffending, "when compared with the effects of noncustodial sanctions such as probation." *Id.* Specific deterrence is therefore not achieved by harsher sentences.[13]

Moreover, Gordon was the primary figure in the money laundering conspiracy, with Ms. Elstein also playing a significant role. It is unlikely that Elstein will be involved in future money laundering when he was not the driving force behind it, and he voluntarily stopped participating in both conspiracies more than ten years ago. The court therefore concludes a custodial sentence is not necessary to deter Elstein from engaging in further criminal activity.

### C.      Incapacitation

A term of imprisonment is warranted particularly when incapacitation is needed to protect the public and victim from future harm. *See United States v. McGuire*, No. 23-6145, 2024 WL 2873776, at *1 (10th Cir. June 7, 2024) (citations omitted). Incapacitation physically removes a person's ability to engage in criminal conduct. *See* Raquel Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 Dick. L. Rev. 461, 471 (2024).

Here, Elstein stopped participating in the conspiracies in 2013 when he realized the potential consequences it could have on his children. This self-rehabilitation occurred more than four years prior to his arrest. In the subsequent six years and nine months he has been on pretrial release, Elstein has committed no other crimes. Incarceration, therefore, is not necessary to protect the public from future harm by Elstein. This factor weighs in favor of Elstein.

---

13  Simply because a harsher sentence may not result in specific deterrence, this does not mean a harsher sentence should never be imposed. Sentencing involves consideration of multiple factors, and when all are considered, other factors may support a substantial period of incarceration depending on the crime. This includes white-collar crimes that harm many individuals, such as Ponzi schemes.

### D.     Rehabilitation

Under 18 U.S.C. § 3553(a)(2)(D),[14] Congress has instructed that the defendant's need for "educational or vocational training, medical care, or other correctional treatment" should be considered when sentencing.  None of these factors are at issue with respect to Elstein.  He runs a successful business, has no drug or alcohol addictions, is a committed father to his three minor children, and is a strong contributor to his community.  This factor weighs in favor of Elstein.

## III.     THE SENTENCES LEGALLY AVAILABLE

Under a Felony Information, Elstein pled guilty to two counts:  conspiracy to distribute marijuana and conspiracy to commit money laundering.  Felony Info., at 2, 14 (ECF No. 247); Elstein Plea Statement, at 1–3 (ECF No. 253).  Neither count, as pled, is subject to a mandatory minimum sentence of imprisonment, and the maximum sentence for each count is twenty years imprisonment.  If the court imposes a term of probation, in may be no less than one year and may be up to five years.  Count one has a three year mandatory term of supervised release.  Count two has a range of zero to three years of supervised release.

## IV.     SENTENCING COMMISSION GUIDELINES

Elstein objected to the calculated total offense level and guideline range contained in his presentence investigation report.  Subsequently, the United States and Elstein conferred about what enhancements or reductions should apply when calculating Elstein's total offense level.  The

---

14    A tension exists "between two provisions of the sentencing guidelines." *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011).  Under 18 U.S.C. § 3582(a), Congress admonished that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  That admonishment is in tension with 18 U.S.C. § 3553(a).  The Tenth Circuit has reconciled this tension by stating "a court can pursue the goal of rehabilitation in sentencing," but "it cannot do so in" determining whether to incarcerate an individual or what the length of incarceration should be.  *Cordery*, 656 F.3d at 1106.

United States and Elstein resolved their dispute by entering into a Stipulation of the Parties Regarding Sentencing Factors (ECF No. 317).  Pursuant to that stipulation, the parties have agreed "Elstein's total offense level is 29," with "no countable criminal history," and a Sentencing Guidelines range of 87 to 108 months.  *Id.* ¶ 4.  Based on the parties' stipulation, the court accepts the total offense level and Guidelines range stated in the stipulation.

## V.  SENTENCING COMMISSION POLICY STATEMENTS

Recently, the Sentencing Guidelines were amended to recognize that "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood," which is a person's "mid-20's."  U.S. Sent'g Guidelines Manual § 5H1.1 (U.S. Sent'g Comm'n 2024).  "The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age."  *Id.*  Thus, "in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing."  *Id.*

In this case, Elstein became involved in the conspiracies in his early twenties.  He was influenced by Gordon and his lifestyle.  After Elstein became a father and entered his late twenties, he began to see his risk-taking behavior differently.  He voluntarily elected to leave the conspiracies, and he has continued to show his commitment to leave his criminal conduct behind him as he has complied with all terms of his pretrial release since his arrest in 2018.  In accordance with the new policy statement, these factors weigh in favor of Elstein receiving a form of punishment other than imprisonment to meet the purposes of sentencing.

Elstein also "believes that departures for his . . . family circumstances, and charitable contributions are appropriate under their respective guidelines provisions or under § 5K2.0."  Elstein Reply Mem., at 4 (ECF No. 327).  The Sentencing Reform Act requires sentencing to be

neutral about a person's socioeconomic status and typically to avoid taking into consideration a person's "education; vocational skills; employment record; family ties and responsibilities; and community ties" when considering a downward departure.  U.S. Sent'g Guidelines Manual, ch. 5, pt. H, introductory cmt. (U.S. Sent'g Comm'n 2024).  The court does not find that a downward departure is warranted based on these factors, but Elstein's role as a primary caregiver of three minor children does factor into the court's analysis when considering below whether a variance is appropriate.

## VI.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

When imposing sentence, a court must avoid unwarranted sentencing disparities.  For this factor, "[a] district court may consider sentencing disparities between co-defendants, but the purpose of the Guidelines is not to eliminate disparities among co-defendants, but rather to eliminate disparities among sentences nationwide."  *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008) (citations omitted).  "[D]isparate sentences are allowed where the disparity is explicable by the facts on the record."  *Id.* (quotations and citation omitted).  Additionally, "disparity among co-defendants is justified when sentences are dissimilar because of a plea bargain," or when a co-defendant has "cooperated with the government."  *Id.* (quotations and citations omitted).

Elstein's total offense level is 29 and his Guidelines range is 87 to 108 months.  The United States has recommended that Elstein receive a sentence of 48-months imprisonment.[15]  Briefing

---

15  The United States contends Elstein should be imprisoned because some drivers, who were transporting marijuana for the conspiracy in this case, were caught and imprisoned in other states.  Other than the quantity of drugs involved, the court has no information about the drivers, their criminal history, or the factors that were considered by the sentencing courts.  Accordingly, this court does not base its sentencing decision on such unknown factors.

in this case did not focus on nationwide sentencing statistics for marijuana distribution and money laundering conspiracies.  In other words, the record does not show where a 48-month term of imprisonment falls when compared to sentences nationwide.  Because federal prosecutions have varied significantly across states for marijuana distribution, at least for the marijuana conspiracy, the disparity factor has an inherent problem due to some cases being prosecuted and some not, with no corresponding sentence.  Disregarding the number of cases that receive no sentence in favor of only looking at those where a sentence was imposed, fails to reflect a "no sentence" result is occurring for marijuana distribution cases.

The recommended sentences for the other defendants also are informative in this case.  Despite the significant role Gordon, Justice, Viets, and Ms. Elstein played in one or more of the conspiracies, the United States recommended one year probation for Ms. Elstein and a term of imprisonment for the other three as low as zero-months imprisonment.  The disparity between the sentence recommended for Elstein versus those recommended for Ms. Elstein, Gordon, Justice, and Viets does not appear to be supported by the facts, but the recommended sentences for the other defendants is indicative of what is warranted for a sentence in this case.

Ms. Elstein was involved in the marijuana conspiracy.  At times, she was involved in inventorying, packaging, and labeling the marijuana.  She also was involved in tracking what had been paid and what was owed for the marijuana distributions.  Ms. Elstein's involvement in the money laundering conspiracy began in 2009.  She was trained by Gordon and played a significant role in the money laundering.  Although Ms. Elstein only pled guilty to one count for participating in the money laundering conspiracy, her total offense level (29) and Guidelines range (87 to 108 months) were the same as Elstein's.  She signed no cooperation agreement and did not complete

even one debriefing with the United States.[16]  She also violated the terms of her pretrial release on multiple occasions.  Yet, the United States entered a Rule 11(c)(1)(C) agreement with her to receive one year of probation.  She has been non-compliant since she has been on probation, has tested positive for cocaine use, and has been incarcerated two times during the pendency of this case due to her drug use.

In contrast, Elstein debriefed twice with the United States, and the second debriefing pertained to the United States questioning Elstein about Justice, a good friend of Elstein, about Justice's role in the conspiracies.  *See* Hearing Tr., at 39–40 (ECF No. 380).  Yet, Elstein received no acknowledgement or benefit from his debriefing.  Justice debriefed only once, but he received a cooperation agreement with the United States.  Because Elstein provided debriefing comparable to Justice and that exceeded Ms. Elstein's debriefing, the "cooperation" factor does not appear to justify the sentencing disparities.

As for Gordon, he cooperated significantly with the United States and met with the government multiple times to debrief.  Under his plea agreement, he avoided pleading to being a leader in either conspiracy, thereby avoiding an enhancement, but qualifying him for a 2-point reduction under the Section 5C1.2 safety valve criteria.  The result was a total offense level of 25 for Gordon and a Sentencing Guidelines range of 57 to 71 months.  Even with that reduced offense level and Guidelines range, the United States agreed to a sentencing range as low as zero-months imprisonment.  This is so despite Gordon violating the terms of his pretrial release on multiple occasions, even with lax supervision.

---

16  Ms. Elstein met with the United States, but the debriefing was terminated because Ms. Elstein struggled during questioning.

While the court recognizes the appropriateness of a reduction in points for cooperation, Gordon's role in the conspiracy was critical.  Imposing a 48-month term of imprisonment on the mentee (Elstein), who was young and impressionable at the time of the conspiracy, and a one-year probation term on the trainee (Ms. Elstein), while the mature and experienced trainer and mentor (Gordon) has a Rule 11(c)(1)(C) agreement recommending a sentence as low a zero-months imprisonment is an unwarranted disparity that cannot be justified when the totality of circumstances is considered.  This factor weighs in favor of imposing a term of probation on Elstein to avoid unwarranted sentencing disparities.

## VII.    THE NEED FOR RESTITUTION

Neither conspiracy involved any known victims for purposes of restitution.  The United States asserts, however, that the State of California lost tax-payer money because the marijuana purchased in California was done through illegal channels.

In this case, there were no counts for tax fraud because taxes were paid on the marijuana proceeds, despite the operation being illegal.  If that is true in this case, it also has the potential to be true for those selling marijuana wholesale in California.  The United States presented no evidence that the wholesalers failed to pay taxes on their illegally gotten proceeds.  Rather, the United States made a blanket assertion.  More is required, and the need for restitution has not been shown in this case.

## VIII.    PROBATION AND FORFEITURE

"[A] district court must give serious consideration to the extent of any departure from the Guidelines," and "a major departure should be supported by a more significant justification than a minor one."  *Gall v. United States*, 552 U.S. 38, 46, 50 (2007).  The same is true for a variance.  Nevertheless, as stated above, extraordinary circumstances are not required "to justify a sentence

outside the Guidelines range." *Id.* at 47. There is no "ascertainable method of assigning percentages to various justifications." *Id.* at 49. Additionally, "the Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Id.* at 59.

"[C]ustodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* at 48 (citations omitted). Probation is a punishment for purposes of retribution, and the court expressly notes probation is one of the acceptable statutory punishments in this case. Although the Sentencing Guidelines recommend no probation and that a term of 87 to 108 be imposed, that is only one factor.

The court recognizes that Elstein was a leader in the marijuana conspiracy and played a primary role in the money laundering conspiracy. The length of the conspiracies, volume of the marijuana, and amount of the proceeds show Elstein was immersed in a criminal life. That life, however, involved no violence, no firearms, no cartels, and no gangs. Elstein voluntarily left the conspiracies and determined to build a different life for himself and his family. He succeeded. Elstein has been fully compliant throughout his pretrial release. Although pretrial release is not a punishment, Elstein's life has been under scrutiny for an extended period of time, with no return to criminal activity by Elstein. He poses no risk to the public, is not in need of rehabilitation, and is unlikely to commit any future crime.

Elstein's age also is a relevant factor in the court's analysis. Elstein was twenty-one years old at the time he entered the conspiracy. He was young and impressionable and saw Gordon as a mentor and role model. As Elstein matured, he came to realize his criminal life was not what he desired for himself or his family.

Also relevant are the sentences the United States deemed reasonable for the other defendants. Elstein's Guidelines range is 87 to 108 months. It is the same range calculated for Ms. Elstein, who did not debrief with the United States and who was a primary participant in the money laundering conspiracy. She also participated in and personally benefitted from the marijuana conspiracy. She was less than candid with the court during her change of plea and at sentencing, and her problematic behavior has continued during her probation where she has been non-compliant. Yet, based on a government recommended sentence, she received a term of one-year probation.

Apparently due to cooperation agreements, the government agreed to sentences for the remaining defendants as low a zero-months imprisonment. Elstein had no cooperation agreement, but he debriefed twice with the government. Hearing Tr., at 39 (ECF No. 380). Elstein's "second debrief involved specifically Mr. Justice and it was a result of that debrief that Mr. Justice eventually pled guilty." *Id.* at 39–40. The court cannot reconcile a 48-month term of imprisonment for Elstein based on the facts of this case and the sentences for the other defendants that the government deemed reasonable.

This case exists within a complex and changing society, both in terms of how recreational use of marijuana is viewed, and in terms of studies showing harsher sentences for white-collar crimes are untethered from empirical evidence of their deterrent effect. Elstein was arrested more than four years after he stopped participating in the conspiracies and has paid a $10,000,000 forfeiture amount. In this case, the court concludes the certainty of prosecution for money laundering, the forfeiture consequences, and the length of probation provide a sufficient deterrent effect to show crime does not pay.

Finally, while not determinative, the court does note that Elstein is the primary caregiver for his three minor children.  Based on Ms. Elstein's present life choices and circumstances, the children do not have another caregiver who can provide primary care at this time.

Viewing the § 3553 factors together and the totality of circumstances, the court concludes a downward variance from the Sentencing Guidelines is warranted, and that a sentence of three-years-probation, together with the $10,000,000 already forfeited, is sufficient but not greater than necessary to meet the purposes of sentencing.

## **CONCLUSION**

For the reasons stated above, the court imposes a sentence of three-years probation on Elstein, together with a forfeiture amount of $10,000,000, which amount has already been paid by Elstein.  The conditions of probation will be included in the Judgment.

DATED this 8th day of January, 2025.

BY THE COURT:

Clark Waddoups
United States District Court

39